IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JOSEPH A. JOHNSON                                                                                    PLAINTIFF

VS.                                            3:14CV02405-BRW

LEBANON HMA, LLC, d/b/a
University Medical Center                                                                    DEFENDANT

**ORDER**

Pending is Defendants' Motion for Summary Judgment (Doc. No. 32). Plaintiff has responded and Defendant has replied.[1] For the reasons set out below, the Motion is GRANTED.

**I.     BACKGROUND**[2]

Plaintiff, who is Caucasian, worked for Defendant as a registered nurse from August 2011 until October 2013. From the beginning, Plaintiff believed he was an outsider to a "clique" of coworkers who had worked there for a long time. The clique included Deana Reynolds, Tammy,[3] Donna Kellow, and two other women – all are Caucasian. According to Plaintiff, about halfway through his employment, members of the clique (and other coworkers) warned him to watch his back around two African-American coworkers who they believed were racists. However, Plaintiff got along well with those two co-workers, which he believes bothered the clique.

Plaintiff's ex-wife is African-American and he felt like he was "kind of ostracized" by his coworkers because of this. Midway through his employment, several coworkers asked Plaintiff

---

[1]Doc. Nos. 37, 39.

[2]Unless otherwise noted, the facts in this section come from the parties' statements of material facts not in dispute. Doc. Nos. 34, 38.

[3]Plaintiff could not recall Tammy's last name.

1

about his ex-wife out of curiosity, but the only one who repeatedly brought it up was Ms. Kellow. One time she commented that "she did not know how anybody could ever date outside their race or marry outside their race." Plaintiff thought this comment was a racial slur, because it implies that something is wrong with the other race. However, he did not report the incident to management.

In January 2013, Plaintiff filed a complaint with management regarding numerous issues he had with Ms. Kellow, *e.g.*, her frequent smoke breaks, behavior in front of patients, and arguments with family members over the phone. His complaint advised that he would not "tolerate being placed in a hostile work environment." After an investigation, Defendant suspended Ms. Kellow without pay.[4] After her suspension, members of the clique retaliated against him as a result "by falsely trying to have him written up, demeaning him by making him perform menial tasks, not helping him handle the workload, and being too focused on their personal lives." Though Plaintiff had issues with the clique before Ms. Kellow was suspended, "it really got bad" afterwards.

In October 2013, Plaintiff was involved in an altercation with a patient. Pursuant to company policy, Defendant was going to place Plaintiff on administrative leave while conducting an investigation. When Plaintiff's supervisor called him to her office to advise him of the decision, Plaintiff told her that she "was out to get him, that he did not feel safe at [the workplace] because he was being questioned about a false complaint," and that he believed she was retaliating against him for getting Ms. Kellow suspended. Plaintiff resigned during the meeting.

---

[4]It is disputed as to how long Ms. Kellow was suspended, but this is not material.

2

Plaintiff claims he resigned because a complaint of patient abuse was serious and could put his nursing license at stake. He felt that the suspension was the beginning of the end and he had no choice but to quit.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided on purely legal grounds.[5] The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.[6]

A court must view the facts in the light most favorable to the party opposing the motion[7] and may not "weigh the evidence and determine the truth of the matter . . . ."[8] The moving party must "identify portions of the record that demonstrate the absence of a genuine dispute over material facts."[9] It can do this "by presenting affirmative evidence that negates an element of the nonmoving party's claim or by demonstrating 'an absence of evidence to support the nonmoving party's case.'"[10] If the moving party meets this burden, "the nonmoving party must 'make a showing sufficient to establish the existence of an element essential to that party's case, and on

---

[5] Fed. R. Civ. P. 56.

[6] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[7] *Van Gorder v. Grand Trunk Western Railroad, Inc.*, 509 F.3d 265, 268 (6th Cir. 2007).

[8] *Anderson*, 477 U.S. at 249.

[9] *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

[10] *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

3

which that party will bear the burden of proof at trial.'"[11] Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment.[12]

## III. DISCUSSION

Plaintiff asserts that he was subject to a hostile work environment because of his affiliation with African-Americans. To succeed on this claim, he must establish that:

> (1) [he] belonged to a protected group, (2) [he] was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.[13]

Based on the undisputed material facts, Plaintiff cannot meet his burden. The majority of Plaintiff's allegations are not race-based, and the coworkers' comments that are race-based are not severe or pervasive enough to alter the conditions of employment and create an abusive working environment.

A court must consider the "totality of the circumstances" when determining whether the work environment was hostile or abusive.[14] It may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[15] "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work

---

[11]*Id.*

[12]*Anderson*, 477 U.S. at 249.

[13]*Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011).

[14]*Id.*

[15]*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

4

environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview."[16]

The only "unwelcome racial comments"[17] Plaintiff cited were questions about his ex-wife being African-American, a comment from Ms. Kellow about dating outside of her race,[18] and suggestions from coworkers for Plaintiff to avoid two African-American women who were allegedly racist. These race-based comments cited by Plaintiff were, at most, "mere offensive utterances" that were neither severe, humiliating, nor physically threatening.

Plaintiff also provided numerous examples of unprofessional behavior by his coworkers, but their behavior had nothing to do with his association with African-Americans. In fact, Plaintiff testified that "there was a little bit of friction" from the very beginning – before anyone even knew of his association with African-Americans – and he felt "ostracized" because the clique was looking at him wondering "who is this know-it-all coming into our place."[19] Plaintiff's troubles with coworkers may have been based on the clique believing he was out to get them in trouble, was "not going along with everything" they did, and the fact he got his work done while they goofed off.[20]

Plaintiff testified that things got worse after he filed a complaint with management regarding Ms. Kellow's frequent smoke breaks, behavior in front of patients, and arguments with

---

[16]*Id.* at 21-22.

[17]*Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009) (The second and third prongs can be met by introducing evidence that he "was subjected to unwelcome racial comments as a result of [his] association with or advocacy for protected employees . . . .").

[18]Plaintiff testified that only Ms. Kellow would "constantly bring up" the issue of his ex-wife, but "everybody else let it go." Doc .No. 32-1, at 157.

[19]Doc. No. 32-1, at 245.

[20]*Id.* at 143.

5

family members. Though he advised Defendant that he would not "tolerate being placed in a hostile work environment," there was no claim that he was being treated differently – by Ms. Kellow or anyone else – because of his affiliation with African-Americans. In fact, Plaintiff admitted that Ms. Kellow acted unprofessionally around everyone, not just him. Additionally, he testified that both Tammy and Ms. Kellow behaved this way from day one – before they knew about his ex-wife and before he was friendly with the two African-American co-workers. Plaintiff's complaints about his coworkers go to a lack of professionalism, in general, rather than hostility toward him because of his affiliation with African-Americans. In fact, he admits that the clique behaved this way even when he was not around. Furthermore, he conceded that tension with the clique grew because he filed a report which resulted in Ms. Kellow's suspension,[21] not his affiliation with African-Americans.

Plaintiff described another situation, after Ms. Kellow's suspension, of more "deterioration" in his relationship with coworkers. Plaintiff informed his supervisor, "Robin," that he and a coworker – Tammy – thought Robin was loafing while they felt overwhelmed.[22] Robin took issue with the comment and Plaintiff's relationship with her deteriorated. As a result she had him perform activities that he did not like, though they were part of the job.[23] Plaintiff also complained that his coworkers were "less than helpful" and did not behave properly in front of the patients.[24]

---

[21] *Id.* at 196 ("I knew Deana was out for revenge because of Donna.").

[22] *Id.* at 101-107.

[23] *Id.* at 132-133. Plaintiff testified that he had to do a "one-to-one observation" of patients for lengthy periods of time and other menial tasks.

[24] *Id.* at 133-34.

Though the harassing conduct does not have to be "explicitly race-based," Plaintiff must establish that "but for the employee's race, [he] would not have been the object of harassment."[25] He has not met his burden. Additionally, the complained-of conduct "must be <u>extreme</u> to amount to a change in the terms and conditions of employment."[26] None of actions or comments Plaintiff complains of are extreme. Furthermore, a reasonable person would not conclude that they created a hostile or abusive work environment.

"It is a simple fact that in a workplace, some workers will not get along with one another, and this Court will not elevate a few harsh words or 'cold-shouldering' to the level of an actionable offense."[27] Basically, Plaintiff was surrounded by several unprofessional (in his opinion) coworkers who spent more time gossiping, talking on the phone, and visiting about their personal lives than handling patients. Though some coworkers asked about his affiliation with African-Americans, there is no evidence that their behavior toward Plaintiff had anything to do with this affiliation. Based on the totality of the circumstances, Plaintiff cannot establish that he was subject to hostile work environment based on his affiliation with African-Americans.

## CONCLUSION

Based on the findings of fact and conclusions of law above, Defendant's Motion for Summary Judgment (Doc. No. 32) is GRANTED. This case is DISMISSED with prejudice.

IT IS SO ORDERED this 19th day of May, 2016.

/s/ Billy Roy Wilson
UNITED STATES DISTRICT JUDGE

---

[25]*Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007).

[26]*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (emphasis added).

[27]*McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 564 (5th Cir. 1998).

7